FILED
2021 Oct-14  PM 12:50
U.S. DISTRICT COURT
N.D. OF ALABAMA

# DEFENDANT'S EXHIBIT C

# DEPOSITION OF WILLIAM MESSERSCHMIDT

1

1       IN THE UNITED STATES DISTRICT COURT

2      FOR THE NORTHERN DISTRICT OF ALABAMA

3          NORTHEASTERN DIVISION

4

5  PHILIP D. SISK, JR.,    )

6      Plaintiff,    )

7                  )

8  VS.             )  CIVIL ACTION NO:

9  SERGII FEDOROVYCH, et al.,)  5:20-CV-00620-LCB

10                )  ZOOM DEPOSITION OF:

11      Defendants.   )  WILLIAM MESSERSCHMIDT

12

13     S T I P U L A T I O N S

14      IT IS STIPULATED AND AGREED, by and

15  between the parties through their respective

16  counsel, that the Zoom deposition of:

17        WILLIAM MESSERSCHMIDT,

18  May be taken before Cathy A. DeBardeleben,

19  Commissioner and Notary Public, State at Large,

20  Birmingham, Alabama, on the 1st day of September,

21  2021, commencing at approximately 10:00 a.m.

22

23

1    IT IS FURTHER STIPULATED AND AGREED that

2   the signature to and reading of the deposition by

3   the witness is waived, the deposition to have the

4   same force and effect as if full compliance had

5   been had with all laws and rules of Court relating

6   to the taking of depositions.

7

8    IT IS FURTHER STIPULATED AND AGREED that

9   it shall not be necessary for any objections to be

10  made by counsel to any questions, except as to form

11  or leading questions, and that counsel for the

12  parties may make objections and assign grounds at

13  the time of the trial, or at the time said

14  deposition is offered in evidence, or prior

15  thereto.

16                    ***

17

18

19

20

21

22

23

```
 1              A P P E A R A N C E S

 2

 3  ON BEHALF OF THE PLAINTIFFS (via Zoom):

 4          JOE A. KING

 5          Attorney at Law

 6          Morris, King & Hodge, P.C.

 7          200 Pratt Avenue NE

 8          Huntsville, Alabama  35801

 9          jking@mkhlawyers.com

10

11  FOR THE DEFENDANTS:

12          PAUL A. MILLER

13          Attorney at Law

14          Miller, Christie & Kinney, P.C.

15          500 Office Park Drive

16          Suite 210

17          Birmingham, Alabama  35223

18          pmiller@mck-law.com

19

20

21

22

23
```

⌃                                                        4

```
 1          TRAVIS I. KEITH (via Zoom)
```

```
 2        Attorney at Law

 3        Gaines Gault Hendrix PC

 4        361 Summit Boulevard

 5        Suite 200

 6        Birmingham, Alabama  35243

 7        tkeith@ggh-law.com

 8

 9        WILLIAM L. MIDDELTON (via Zoom)

10        Attorney at Law

11        Eyster, Key, Tubb, Roth,

12        Middleton & Adams, LLP

13        P.O. Box 1607

14        Decatur, Alabama  35602

15        wlmiddleton@eysterkeylaw.com

16

17        CONLEY W. KNOTT (via Zoom)

18        Attorney at Law

19        Austill Lewis Pipkin & Maddox, P.C.

20        600 Century Park South

21        Suite 100

22        Birmingham, Alabama  35226

23        cknott@maplaw.com
```

5

 1

2                    I N D E X

3

4          MR. MILLER:  5-40

5

6          E X H I B I T   L I S T

7

8     Defendant's Exhibit Number 1 -  7

9              Notice

10    Defendant's Exhibit Number 2 - 8

11           Electronic file

12            (Retained)

13

14

15

16

17

18

19

20

21

22

23

1          I, Cathy A. DeBardeleben, a Court Reporter

2     of Birmingham, Alabama, and a Notary Public for the

3    State of Alabama at Large, acting as Commissioner,

4    certify that on this date, pursuant to Federal

5    Rules of Civil Procedure and the foregoing

6    stipulation of counsel, there came before me on the

7    1st day of September, 2021, Birmingham, Alabama,

8    commencing at approximately 10:00 a.m., WILLIAM

9    MESSERSCHMIDT, witness in the above cause, for oral

10   examination, whereupon the following proceedings

11   were had:

12         THE REPORTER:  Usual stipulations?

13         MR. MILLER:  Yes.

14         MR. KING:  Yes.

15         MR. MIDDLETON:  Yes.

16         MR. KNOTT:  Yes.

17         MR. KEITH:  Yes.

18         THE REPORTER:  Any objection to me

19   swearing the witness in remotely?

20         MR. KEITH:  No.

21         MR. KNOTT:  No objection.

22         MR. MIDDLETON:  No.

23         MR. MILLER:  No.

1              WILLIAM MESSERSCHMIDT,

2    being first duly sworn, was examined and testified

3  as follows:

4  EXAMINATION BY MR. MILLER:

5  Q        Would you state your name, please, sir?

6  A        Sure.  William Messerschmidt.

7                              (Defendant's Exhibit

8                               Number 1 was marked

9                               for identification).

10  Q        Okay.  And, Bill, I've deposed you several

11  times over the years, so I'm not going to spend a

12  whole lot of time on information about your background

13  and that sort of thing.  But I've marked as

14  Defendant's Exhibit 1 your deposition notice for

15  today.  Have you seen that notice?

16  A        Yes, sir, I have.

17  Q        All right.  And in that deposition notice, I

18  had 12 different requests for production of documents.

19  And have you done your best to obtain those documents

20  and produce them to us?

21  A        Yes, sir, I have.

22  Q        All right.  Well, is there anything that I

23  asked for that you were unable to obtain or did not

1  have?

2  A        Well, the only thing -- and perhaps I misread

3  it.  I have a list of cases in which I've testified in

4    mediation -- well, any sworn testimony over Zoom or

5    live.  I don't have a list of every time me or my

6    company has been hired to consult on a case.

7    Q      Okay.  Earlier this morning, Joe, your office

8    sent to, I believe, everybody that's on this

9    deposition the materials that were responsive to my

10   requests; is that right?

11   A      That's correct, yes, sir.

12          MR. KING:  Yes, sir.

13   A      That's correct.  And let me apologize.

14   Mr. King sent me the request around 3:30 yesterday or

15   3:00 -- somewhere around.  Somewhere while I was in

16   the dentist chair getting crowns put on my molars.  So

17   it didn't happen during business hours because I was

18   at the dentist.  Otherwise, you would have had it

19   maybe earlier.

20   Q      No apologies needed.

21                          (Defendant's Exhibit

22                          Number 2 was marked

23                          for identification).

                                                          9

1           MR. MILLER:  So I've marked as Defendant's

2    Exhibit 1 your deposition notice.  Joe, what I thought

3    we would do is just -- I'm going to mark as

4   Defendant's Exhibit 2 all of the materials that were

5   sent to me yesterday.  And I'll figure out with Cathy

6   the easiest way to have that made an exhibit to the

7   deposition, if that's all right with you.

8          MR. KING:  No issue whatsoever.

9   Q      (By Mr. Miller) All right.

10  A      May I make one suggestion there?

11  Q      Yes, sir.

12  A      In that link is a folder called Pix, P-I-X,

13  4D, Delta, mapping.  That is drone overflight photos.

14  It is 4,669 different pictures.  So it's photos, but

15  it's just the drone taking pictures down at the earth.

16  You may not want to print all of those out.  Just

17  stick them on a thumb drive of the videos.

18  Q      Okay.  Like I said -- I appreciate you

19  pointing that out.  We will figure out the most

20  efficient way to get that.  As a matter of fact, I

21  guess, if everybody received it, can we just agree

22  that that's Exhibit 2 to the deposition?

23         MR. KING:  Fine by me.

1   Q      All right.  Bill, what I want to do is to

2   make sure I understand what all you've looked at to

3   come up with your opinions in this case.  I have

4   before me -- and I don't know if you've seen this, but

5   it's Joe's plaintiff's expert disclosures, of which

6   you were one of the experts Joe disclosed.

7          And attached as an exhibit to that is a

8   report that you prepared on May 18, 2021 to Joe that

9   outlines basically what you've reviewed and what your

10  opinions are in this case.  Are you familiar with the

11  document I'm referring to?

12  A       Yes, sir, I am.

13  Q       Okay.  Now, this was prepared back in May.

14  And it appears, based on what you sent us yesterday,

15  that since that report, you have looked at a couple of

16  depositions, namely the plaintiff and then Sergii's

17  deposition; is that correct?

18  A       Yes, sir, that's correct.

19  Q       All right.  Has there been anything else that

20  you've reviewed, other than those two depositions,

21  other than what's set out that you reviewed in your

22  letter of May 18, 2021?

23  A       The only thing that I -- that might fall

1   under that category was just -- I printed and uploaded

2   this morning or last night just a formal written

3   description of what gross vehicle weight rating is.

4   Because there are two different ways it can be

5  calculated.  And I didn't want to get them confused.

6  Q       Okay.  And that is part of what you sent us

7  this morning?

8  A       Yes, sir.

9  Q       Okay.  Other than that, and the two

10 depositions, have you reviewed everything as set out

11 in your report as of May 18, 2021?

12 A       Yes, sir, I have.

13 Q       Did the review of the deposition transcripts

14 and/or the gross weight information you just told us

15 about, did it affect, change, or alter your opinions

16 as set out in the May 18 letter in any way?

17 A       No, sir, it did not.

18 Q       Okay.  Now, it appears to me that you were

19 first contacted by Joe to assist him in this case back

20 in April of this year; is that correct?

21 A       I think actually the very first time he

22 contacted me was in maybe March.

23 Q       Okay.

                                                        12

1  A       But then we sort of missed each other for a

2  month, and really got going in April.

3  Q       Okay.  Now, there's a fella named Jerry Key

4  whose name shows up throughout the materials you sent

5  in your report.  Who is Jerry?

6  A        Well, as of June 1st, Jerry Key is an

7  employee of my company.  From 2011 or '13, eight or 10

8  years ago, all the way up until June, Jerry was an

9  independent contractor who we used an awful lot.  He

10  had his own business, did his own consulting,

11  testified for his own clients.

12         And with the way things changed, both for our

13  business and in the federal laws and interpretations

14  of what an employee is during the pandemic, we decided

15  at the beginning of this year mutually that Jerry

16  needed to come on as an employee.  And that became

17  effective June -- I think it was June the 1st.  It

18  might have been July the 1st, but right around then.

19  Q        Okay.  Because it appears that Jerry did --

20  apparently was hired by Joe before you were hired to

21  do some work; is that your understanding?

22  A        Yes, sir, it was.

23  Q        Okay.  And it appears that he did his work

1  back in the early 2019 time frame.  And it appears

2  that you utilized his work product in coming up with

3  your opinions; is that a fair and accurate

4  representation?

5  A        Yes, sir, I did use Jerry's work.

6   Q       Besides Jerry's work that you've set out in

7   your letter here, what independent work did you

8   perform in coming up with your opinions?

9   A       Well, I did an independent evaluation of the

10  air bag module data, for example.  I did the analysis

11  of the video with INPUT-ACE software.  Madelyn Hudson,

12  one of my employees, and I worked together on the

13  virtual crash simulation to just add one more level of

14  sanity check to make sure, you know, things were the

15  way they appeared.

16         And I worked with Mr. Mayer to make sure that

17  the timing of his animation was , you know, realistic,

18  accurate and consistent with the, you know, physical

19  evidence.  You know, of course, I reviewed the state

20  trooper photos, did later review the depositions.  I

21  worked with my employees, particularly Madelyn and

22  James, to do some research on that Quality trailer's

23  50-foot car hauler.

                                                    14

1          So those were things -- I think that's all of

2   them.  But there may be one or two small tasks.  But

3   that was work that I did or directed my employees to

4   assist me in doing.

5   Q       Okay.  Do you agree, Bill, as an accident

6   reconstructionist, that the more information you have

7   generally, the better for you to render opinions?

8   A       Generally that's true.

9   Q       All right.  Is there anything in this

10  particular case that you do not or did not have access

11  to that you would have liked to have had access to in

12  rendering your opinions?

13  A       Well, in a perfect world, it would have saved

14  a lot of time and Mr. King some money if we had

15  downloaded Mr. Sisk's vehicle.  Given that we had

16  fixed frame high definition video, we had the

17  information we would have wanted.  But it was more

18  laborious to go through frame by frame by frame than

19  it would have been to do some simple checks to the air

20  bag module, the accuracy of that data.  So that was

21  sort of in this case no harm no foul.  We had the data

22  from a secondary source.

23  Q       Okay.

                                                        15

1   A       You know, really, that's probably the only

2   thing I can think of, you know, off the top of my head

3   on the wish list of things.  You can always wish the

4   trooper would have stepped one foot to the right or to

5   the left or focused the camera a little differently.

6   But I think we had everything I needed, at least for

7   the opinions I gave.

8   Q        Well, I can assure you I am not terribly

9   concerned about you charging Joe extra money for

10  having to do the work that way.

11          In regard to the plaintiff's vehicle, I'm

12  assuming you're talking about the fact that you used

13  the video that was available to come up with the

14  information on that vehicle?

15  A        Yes, sir.  We started with the video from --

16  I think it was Countryside Vet Clinic.

17  Q        And is that the video that is approximately

18  eight seconds long?

19  A        I think that's the length of time.

20  Q        All right.  Is there any other videos that

21  you looked at, Bill, that you utilized to come up with

22  the information that you set out in your report on the

23  plaintiff's vehicle, other than that eight-second

16

1   video?

2   A        No, sir.  Let me check the time -- the length

3   of time on that video.  But it was just one --

4   probably this was just one -- just one video.  I just

5   don't recall.

6   Q        I may have rounded it off to eight seconds,

7   but I want to make sure.

8   A       So I have got a video that's actually two

9   minutes and 14 -- two minutes and 21 seconds long.

10  Q       All right.

11  A       From Countryside Vet Clinic.  And that's

12  uploaded under the folder "Accident Video."

13  Q       All right.

14  A       Then there are a couple -- I think I did crop

15  those down using Input Ace to a more defined time

16  frame.  But the whole video Mr. King sent me was 2:21.

17  Q       Okay.  So the video that's -- the two-minute

18  video is the same video, you just cropped it down to

19  eight seconds to the pertinent portions of the video

20  that you felt were necessary?

21  A       Well, let me check these two that I cropped.

22  Yeah, I've got one called HHR Pre to Impact that's

23  eight seconds long.  And then I've got an eight second

1   long that's cropped.  So, yes, sir, that was an area

2   that gave specific detail.  I think mostly working

3   with Mr. Mayer on the speed and the artifacts and the

4   background.

5   Q       Okay.  I know you've come up with the speed

6   that the plaintiff's vehicle was going as it entered

7   the intersection.  You referenced that in your report

8  of May 2021, correct?

9  A        Yes, sir.

10  Q        Were you able to come up with any

11  acceleration rates of that vehicle?

12  A        No, sir, I didn't.  I didn't particularly go

13  to any length to calculate it.  They were fairly low

14  vehicle -- the vehicle speed seems fairly constant,

15  you know, not blasting through -- you know,

16  accelerating hard.  And I believe the simulation

17  indicates it's likely there was some last second

18  braking.

19  Q        On the plaintiff's vehicle?

20  A        Yes, sir.

21  Q        All right.  Were you able to determine

22  whether the plaintiff's vehicle started from a stop or

23  was already in motion as it started to approach the

♠                                                              18

1  intersection?

2  A        Definitely already in motion when it first

3  comes into the frame of the video.  And we see the

4  plaintiff well outside the bounds of the intersection

5  traveling straight ahead.  And the plaintiff's

6  vehicle, Mr. Sisk's vehicle, is already in motion when

7  we first see it.

8  Q        So is it your opinion that that plaintiff's

 9  vehicle was never stopped, waiting at the traffic

10  light?

11  A        No, sir.  That's just a question I don't have

12  an answer to necessarily.  He could have stopped in

13  the line of traffic.  We do know that, I think, four

14  cars go through before him.  So he may have stopped,

15  and then accelerated from the start that we just don't

16  see on the Countryside video camera --

17  Q        Were you able to --

18  A        -- and he may have also slowed way, way down

19  and been able to pick up.  We just don't know.

20  Q        All right.  I'm sorry.  I interrupted you.

21  Were you able to determine the speed of the

22  plaintiff's vehicle as it enters the frame of the

23  video?

♠                                                    19

 1  A        At the -- well, I didn't make any effort to

 2  calculate that speed specifically.  It would sort of

 3  be worked in -- it would be worked into Bobby's

 4  animation.  I didn't calculate specific speeds because

 5  we were looking at time and distance and just didn't

 6  derive the speeds coming out.

 7            You would need -- so at the precise point

 8  that it comes into the video, you would need to -- you

9  would need to give him at least a couple of frames and

10 then get the average speed.  Say you took 10 frames

11 and said, well, between frame A and B he moves 10 feet

12 and he does that in one second, so he's going 10 feet

13 per second.

14         So you couldn't get that first initial point

15 because you've got no distance over which to calculate

16 the average speed.

17 Q      Were you able to determine how far away from

18 the intersection he was when he enters the frame?  And

19 I'm talking about the plaintiff's vehicle.

20 A      Yeah, we were able to line him up.  That was

21 one of the things Mr. Mayer and I did over the course

22 of several Zoom calls.  We were able to line him up

23 very precisely with Jerry's mapping and then his drone

1  mapping.  So we were able to put him very close to the

2  exact spot where he is when he enters the

3  intersection.

4  Q      All right.  And how far away from the point

5  of impact was he at that time?

6  A      I don't have that number.  We were -- so we

7  were working within 3D Studio Max, lining the vehicle

8  up, lining the vehicle up with the video.  I wasn't

9  writing down distances from the stop bar at the time.

10  We wanted to make sure the two visuals were in

11  agreement with each other.

12  Q       Okay.  That can be done, though?

13  A       Sure, yeah.  Absolutely, absolutely.  Any of

14  these numbers can easily -- well, can within a matter

15  of probably an hour, be determined to a very close

16  level of, you know, plus or minus a foot or a mile an

17  hour.  Something like that.  We would just need to

18  know, okay, tell me where he is at T-minus 1.3, okay?

19  We can tell you that.  Where is he at T-minus .1.  We

20  can tell you that.

21          We just didn't memorialize every speed, time

22  and distance for every spot on the road.

23  Q       I understand.  Were you at all interested in,

1  or did you determine sight distances from either

2  direction from the accident?

3  A       We didn't go back to a maximum sight

4  distance.  It was clear from Mr. Key's pictures, the

5  trooper's pictures, the trooper's opinion, Google

6  Earth, that the sight distance was, you know, at least

7  750 to a 1,000 feet.  Well, within everyone's ability

8  to work with the intersection and the traffic light.

9  And it wasn't a matter of a sight obstruction that

10  contributed to the accident.

11  Q       And by "sight distance," I want to make sure

12  we're talking about the same thing.  I'm talking about

13  the distance that each one of these vehicles should

14  have been able to see the other.

15  A       Okay.  No, sir, I didn't make any effort to

16  go back and determine the absolute -- say, for

17  example, the first point where it would be possible

18  for Mr. Fedorovych -- if I've mispronounced his name,

19  I'm sorry.

20  Q       Close enough.

21  A       For him to see Mr. Sisk or Sisk to see

22  Fedorovych.  Again, that could be done quite simply

23  from particularly the 3D drone mapping.

⬆                                                              22

1   Q       Have you been out to the scene, Bill?

2   A       No, sir, I haven't.

3   Q       Okay.  Have you looked at any of these

4   vehicles yourself?

5   A       No, sir, I haven't.

6   Q       Okay.  So we could take the information

7   you've provided us and come up with sight distances,

8   if a driver is observant as to when the plaintiff

9   could have seen Sergii and when Sergii could have seen

10  the plaintiff approaching the intersection?

11  A       Sure.  So from the data that we have, we can

12  tell where it's possible for the two vehicles to see

13  each other.  And it may be that it's possible for the

14  two drivers to see each other even further back than

15  we mapped.  I mean, it could be possible to see them

16  from 2,000 feet.  I doubt it, but it could be.

17          Where a driver would see the other one, would

18  likely glance when they would determine that oncoming

19  driver to be, you know, a hazard to which he or she

20  needed to respond.  For either of two drivers.  That's

21  a completely separate question that wouldn't just drop

22  in from the data.

23          The point of first possible perception is

23

1  just going to be a straight line, considering the

2  topography.  The point at which a vehicle becomes

3  something to which he would need to respond or to

4  expect the driver to take notice of as a potential

5  hazard, those would be more specific human factors

6  questions that he would need to back up with some

7  research or opinion.

8  Q       Do you hold yourself out as a human factors

9  expert, Bill?

10  A       Well, I mean, that's what I went to grad

11  school for, and that's what I'm doing graduate work in

12  and testified quite a bit.  I don't -- you know,

13  judges decide whether I'm an expert or not.  But I've

14  got a lot more training and education and work

15  experience than most people.

16  Q        Can we agree that you have not utilized that

17  training and education in rendering your opinions in

18  this case?

19  A        Sure, yeah, that's correct.  There's no

20  opinion in there about perception/response time, how

21  easy it should have been to see that the red light was

22  red, how far back you could tell that the red light

23  was red or at what point Mr. Sisk might have realized

⬆                                                                24

1   someone was running the red light.  That's just a

2   pretty basic time, speed, and distance in keeping with

3   Mr. King's request.

4   Q        Can we agree that it's a reasonable thing for

5   a driver of a motor vehicle to observe potential

6   oncoming traffic in either direction as they're

7   approaching an intersection?

8   A        Generally speaking, people do typically look

9   around in -- look around at an intersection and around

10  an intersection.

11  Q        Okay.  You mentioned earlier that you had

12   determined when both vehicles would have first applied

13   their brakes.  Did I hear you correctly?

14   A        No, sir.  Only that the simulation that we

15   did is -- seems to indicate that Mr. Sisk applied his

16   brakes before impact.  The Delta-V to the Ford F-350

17   becomes a really close max to the EDR with Mr. Sisk, I

18   believe, being hit at 23 miles an hour.  So probably a

19   second of braking pre-impact.

20   Q        Were you able to see the brake lights

21   illuminate on the video?

22   A        I would have to go back and check the video.

23   Q        Okay.

                                                    25

1   A        I don't recall that.

2   Q        All right.  I want to, Bill, talk to you

3   about your opinions.  And I'm referring to your letter

4   of May 8.  And please feel free -- I mean, May 18.

5   Excuse me.

6            Please feel free to review that or look at it

7   as I'm asking these questions, okay?

8   A        Sure.

9   Q        First of all, I want to go to your overall

10   conclusions that are on the last page of your report.

11   Actually, I think it's the next to last page since you

12    have some references on the last page.

13          You say here that the Chevrolet that the

14    plaintiff was driving had a green light for nine to 10

15    seconds as your first conclusion, correct?

16    A     Correct.

17    Q     Can you please tell me all the information

18    that you relied on in coming to that conclusion?

19    A     Sure.  If we go back and look at the video,

20    we see where the first vehicle -- we see the vehicle

21    stopped.  And then we see the first vehicle begin to

22    enter the intersection with the other vehicles around

23    it -- or at least one other vehicle there stopped.

                                                          26

1           So everything there points to this light

2     turns red, this light turns green, this car stops,

3     this car starts moving.  And from that time,

4     it's between nine and 10 seconds before Mr. Sisk

5     enters the intersection.

6     Q     Is that before he enters the intersection or

7     before he's impacted?

8     A     I believe that's before he enters the

9     intersection.

10    Q     Okay.  Did you ever go out there, or do you

11    know if Jerry did, and determine the lighting sequence

12    -- the timing of it out there at the intersection?

13  A        I believe he had -- I believe there is video

14  that Jerry took that shows that.  But we didn't go

15  into a lot of effort to see how long the red phase

16  was, how long the yellow light was for, you know, any

17  direction.

18  Q        Okay.  You also have that the Chevrolet was

19  the fourth one entering the intersection after the

20  light turned green.  That's just looking at the video?

21  Is that the information you used for that?

22  A        Yes, sir.

23  Q        Okay.  Your next opinion is that the

1  plaintiff was traveling at 32 miles an hour.  I'm

2  assuming, based on my reading of your reports and the

3  information you sent, that is as he's entering the

4  intersection, correct?

5  A        Yes, sir.

6  Q        All right.  And, again, did you utilize

7  anything to come up with that speed, other than the

8  video?

9  A        Well, you know, so the video and the diagram.

10  You know, using those two things together.  We've got

11  2D diagrams from Jerry's total station.  And 3D

12  diagrams from Jerry's drone mapping.  And so the

13  diagrams give us very, very, very accurate distances

14  on earth.  So that then when we look at the video,

15  knowing what we know about the attributes of the

16  video, we can then say, okay, point A to point B is 10

17  feet.  It took him 33 frames to go 10 feet, 33 frames

18  is one second.  He went 10 feet in one second.  That's

19  10 feet per second.

20          So I guess the combination of both the 2D

21  diagramming and 3D diagramming and the video that

22  allow Bobby and I to, or me to officially calculate

23  it.  But Bobby and I to get the vehicle lined up and

1  moving past fixed points with the proper timing.

2  Q       Okay.  And, again, we can agree, you don't

3  know what the color of the light was as the plaintiff

4  entered the intersection, correct?

5  A       I think it's quite obvious the light was

6  green.  I mean, I don't know that with the same

7  certainty that I would know it if I were traveling

8  behind him.  I believe it's pretty obvious he entered

9  on a green light.

10  Q       Well, you say that because he entered the

11  intersection, correct?

12  A       Well, no.  I say that because the other

13  vehicles are stopped and waiting.  It's only been nine

14  to 10 seconds since the light turned green in the

15  first place.  Three cars have just gone through.  He's

16  still accelerating.  But, you know, he's moving toward

17  the intersection.

18          And I think the witness was very clear -- the

19  one that Jerry spoke with, was very clear that he saw

20  it happen.  The light was red.  He was in a location

21  and had a good view of it.  And, you know, I think

22  those things all come together to be very strongly

23  indicative of the light being green.

                                                            29

1           And, you know, with the videos Jerry does

2   have of the traffic light, although we didn't, like I

3   said, spend a lot of time figuring out the red and

4   yellow light time for each phase, if there's a car in

5   the left turn lane.  At no point did that light turn

6   back red in fewer than 10 seconds.

7   Q       Okay.  You also say that in regard to the

8   Ford F-350 that it was going 63 miles an hour at some

9   point before the accident.  And that's strictly off of

10  the download information?

11  A       Well, the download information.  And then

12  when you compare that to the video, looking at speed

13  the same way we did for the HHR, it's passing fixed

14  objects in the video.  A little bit more difficult

15  because it's collinear.  But we did a real close match

16  between the air bag control module data and what's

17  captured on the video.

18          And then the simulation, like I said, we kind

19  of ran through that just as a reality check to make

20  sure one more way that everything looked right.  The

21  simulation says, hey, that's all possible and vehicles

22  go generally where they should go.

23          So those three things all together.  The

1  strongest, most compelling of them is the air bag

2  control module data.  But they all converge at the

3  same place.

4  Q       Okay.  What speed did you have -- well, let

5  me ask this:  When did you have Sergii applying his

6  brakes in all of this sequence of events?

7  A       Based on the air bag module data, it's about

8  three seconds before impact, three to three-and-a-half

9  seconds.  And it shows up right there with the brake

10  switch on.

11  Q       What does your human factors training tell us

12  about perception and reaction time?

13  A       Well, a lot.  I teach, like, a several hour

14  class on that.

15  Q        I don't have time for that.  Just give me the

16  Cliff notes.

17  A        People respond differently to different

18  stimuli.  Perception/response time changes with

19  several predictable factors such as, you know,

20  daylight versus dark, intersection and straight roads.

21  And then different types of accident configurations

22  are different in terms of the perception/response time

23  range that we expect for drivers.

31

1           So, you know, an intersection crash like

2  this, versus a side-swipe, versus high speed

3  overtaking, you know, those are different.  Motorcycle

4  riders actually respond differently where --

5  differently than car and truck drivers, who tend to

6  respond very similar to each other in terms of hazard

7  responses.

8           And, you know, on top of that, there are

9  other factors that can affect perception/response

10  time.  Obviously things like stress, fatigue and

11  intoxicants.  Vision problems or health problems, like

12  Parkinson's disease can have a tremendous effect on,

13  especially the reaction phase of your response time.

14           Things like expectancy.  Expectancy is hard

15  to quantify.  But expectancy, urgency, those are two

16  things that, like, for example, Dr. Marc Green has

17  written about in a lot of depth.  So those can either

18  shorten or lengthen, you know, sort of shift the

19  range one way or the other.

20  Q       All right.  Let me narrow it down to this,

21  then, Bill.  In this particular case, with the

22  circumstances that were presented to Sergii, the fact

23  that he applied his brakes at three seconds before

↟                                                          32

1  impact, what would be your opinion, as a human factors

2  expert, a reasonable time to put on his perception and

3  reaction?

4  A       Well, the first thing that we would expect

5  him to react to would be the red traffic signal.  The

6  signal has been red for most likely more than the nine

7  to 10 seconds that Mr. Sisk's signal was green.  If

8  there is an all-red phase of -- which I said we didn't

9  calculate.  But suppose the all-red phase is two

10  seconds, then it's two seconds plus that nine to 10

11  seconds; if it's one second, if it's four seconds.

12          So it's something greater than nine to 10

13  seconds.  Response to red lights should be a half-

14  second if you are paying attention, three quarters of

15  a second, maybe.  It's really pretty simple.  The only

16  time response to a red light gets more complicated

17  than that -- and there is some research by Dr. Chang.

18  If you're close enough to the intersection that you

19  might -- that it might be easier to go through, then

20  you see response times in the range of 1.1, 1.3

21  seconds, where a driver is hung up deciding "stay, go,

22  stay, go." That's kind of the worse case scenario

23  there, if I'm recalling Chang's research there

1  accurately.

2          So in no case should the red light be

3  difficult for Sergii, I guess is what we are calling

4  the gentleman, to have responded to.  He has plenty

5  of, plenty of time.  Given what's apparent is he

6  simply misses -- mentally neutralizes the red traffic

7  signal and doesn't see it.  Whether his response then,

8  where he initially hits the brakes, is to seeing

9  Mr. Sisk or to seeing that he's about to go through a

10  red light, that's one we couldn't really know without

11  being in his head.

12          You know, if the response is to Mr. Sisk --

13  if we just took the traffic signal out of it and said,

14  "Hey, the response is just to Mr. Sisk," that's the

15  response three seconds before impact is probably

16    pretty normal.  You could calculate it.  You need to

17    look at the eccentricity or the offset of the road.

18    And you'd need to kind of work Sergii back.

19          But in terms of, you know, stripping away the

20    traffic light and everything and just saying he's

21    responding as he sees the two vehicles come together,

22    without having kind of calculated it formally, that

23    seems like a pretty normal response time, too, to the

⌂                                                           34

1    path intrusion if this were just a no stop signs just,

2    you know, unsignalized crossing.

3    Q        Well, I guess what I'm trying to find out is:

4    Are you able to provide an opinion as to -- with the

5    reaction occurring at three seconds being that

6    applying the brakes, when the perception would have

7    occurred, whether it's perceiving the red light or

8    perceiving the plaintiff's vehicle?

9    A        No, sir, I don't think that's -- that's

10    really not possible for anyone to determine, unless --

11    if Sergii knows and can testify accurately, like, if

12    he remembers it accurately and can say, "We can take

13    his word for it."  I don't recall if he said that in

14    his deposition or not.

15          But other than that, it would really just be

16    -- honestly, we could never know which of the two he

17  was responding to without taking his word for it.  So

18  we would have to actually look at both and say, "If

19  this, then," and "If that, then."

20  Q       Okay.  Was there anything -- while we're on

21  the subject of depositions, was there anything in

22  either of the deposition of the plaintiff or the

23  deposition of Sergii that you felt was just completely

↑                                                                     35

1  inaccurate, as far as the events they were discussing,

2  based upon your investigation?

3  A       You know what, I really don't recall it well

4  enough.  I skimmed -- I skimmed through the

5  depositions pretty quickly.  The report had been

6  written.  My opinions were what they were.  I don't --

7  my recollection is that neither one of them was exact.

8            And I was glad for the video, you know, and

9  the electronic data.  But I just don't -- I don't

10  recall -- I don't recall there being anything just

11  like absurd in either one.  There may have been, but,

12  I mean, my opinions weren't changing at that point.

13  If someone said the light was, you know, pink or red

14  or, you know, they were going 100 miles an hour or 10.

15  I was real confident that the opinions that I offered

16  were accurate.

17  Q       Did you ask for the deposition transcript, or

18  did Joe just provide them to you?

19  A       Mr. King provided them to me.

20  Q       Okay.

21  A       I mean, I think I did ask -- prior to writing

22  the report back in April.  But, you know, some of the

23  depositions weren't even, I don't think, taken when I

1  got the report done.

2  Q       I guess my question is:  Did you review the

3  depositions to see if there was anything testified to

4  that would affect or change the opinions you had

5  rendered prior to the depositions being taken?

6  A       No.

7  Q       Okay.  You also have in your conclusions

8  about the F-350 being overloaded by 4,400 pounds and

9  its effects on the braking ability of the vehicle,

10  correct?

11  A       Well, specifically the trailer was

12  overloaded.  I don't know that the F-350 was

13  overloaded.  But the trailer was over its gross

14  vehicle rating.

15  Q       And I've got your report here, so I don't

16  want to belabor this issue.  But can you just, in a

17  very layman's terms, explain what your overloaded

18   condition of the trailer section of your report means?

19   A        Sure.  So gross vehicle weight rating is the

20   maximum amount of weight that a trailer is allowed to

21   carry, you know, with a passenger car, pickup truck,

22   SUV.  The maximum amount of weight you're allowed to

23   have going down the road.

1              So if your gross vehicle weight rating is,

2   say, 20,000 pounds, that's the maximum that trailer

3   can weigh.  And in order to determine what your

4   payload capacity is, you take the weight of the

5   trailer, suppose that's 5,000, subtract it from the

6   gross vehicle weight rating.  And say, hey, I've got

7   15,000 pounds left that I can put cargo on this.

8              The same calculation applies for a passenger

9   car.  If you're pulling a trailer, you look at the

10   tongue weight and you have to calculate, okay, this

11   trailer is going to push down on the tongue -- you

12   know, the tongue of the trailer is going to push down

13   on my trailer hitch with 1,000 pounds.  If I weigh

14   250, my son weighs 200, how much weight do we have

15   left to put suitcases in the truck?  So basically it's

16   gross vehicle weight rating is the max.  That weight

17   of the vehicle, plus weight of occupants, cargo,

18    gasoline, everything else can be.

19    Q        Okay.  And your opinion is that the -- what

20    was the difference in the weight, about 4,400 pounds?

21    A        Yes, sir.

22    Q        And your opinion is that 4,400 pounds

23    effectively reduced the braking capacity by half?

1    A        Well, not necessarily.  What we have is the

2    braking capability that's observed at right around

3    half, a little bit more than half.  And it's

4    consistent, given the overloaded nature of the

5    trailer, one of two things.

6             I said in the report either Sergii didn't hit

7    the brakes as hard as he could because that trailer

8    weighed too much.  And, you know, when you tow a

9    trailer that's too heavy, you feel it getting

10   squirrely on you and you are more careful with extreme

11   braking.  And/or somewhere, you know, in conjunction

12   was, as one of the pieces of literature that I

13   uploaded specifically says, you may very well be over

14   the capacity of your brakes to slow it down.

15            So you're making -- just like a

16   tractor-trailer being overloaded and checking the

17   pushrod travel to make sure that the weight you put in

18   the trailer can be safely hauled.  You know, if you

19  overwhelm the brakes on a Honda Civic or a Quality

20  vehicle trailer, they don't get quite the braking

21  efficiency they could at the weight that the trailer

22  was designed to max carry.

23          So it's most likely a combination of those

1  two things.  Driver input, as well as just likely

2  overwhelming the design of the machine.

3  Q       Okay.  Do you know if Jerry measured the

4  brakes on the vehicle or trailer?

5  A       No, sir.  And based on our research, this

6  would have been a disk brake setup, not a pushrod drum

7  setup.  So it wouldn't have been one to be measured

8  that way.

9  Q       Gotcha.  Are there any opinions that you are

10  prepared to render in this case, Bill, other than

11  those that we just reviewed and that are reflected in

12  your letter?

13  A       No, sir, there are not.

14          MR. MILLER:  Okay.  Joe, can we have an

15  agreement that, in the event Bill comes up with

16  additional opinions, you'll let us know and I would

17  potentially have an opportunity to redepose him on

18  those issues?

19          MR. KING:  We will let you know if there are

20   any additional opinions.

21          MR. MILLER:  I'm going to mark then -- and

22   like I said, Joe, you and I and everybody else that's

23   on this call can get together on how best to mark

                                                          40

1    Exhibit 2, which will be the materials that Bill was

2    kind enough to send to us this morning.  And

3    Defendant's 1 is just my notice.  And I'll pass the

4    witness.

5          MR. KING:  Anybody have any other questions?

6          MR. MIDDLETON:  I don't, Billy Middleton.

7          MR. KING:  All right.  I guess we're done.

8               (END OF DEPOSITION).

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

41

1               C E R T I F I C A T E

2

3   STATE OF ALABAMA )

4   JEFFERSON COUNTY )

5

6               I hereby certify that the above

7   and foregoing deposition was taken down

8   by me in stenotype, and the questions and

9   answers thereto were reduced to computer

10  print under my supervision, and that the

11  foregoing represents a true and correct

12  transcript of the deposition given by

13  said witness upon said hearing.

14

15              I further certify that I am

16  neither of counsel nor of kin to the

17  parties to the action, nor am I in

18  anywise interested in the result of said

19  cause.

20    Certificate was signed on September 13, 2021.

21

22    _____
        Cathy A. DeBardeleben, Commissioner
23      ACCR #254 EXPIRES 9/30/22